**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | | |
|---|---|---|
| **JAMES R. THOMAS** | : | **DOCKET NO.  2:13-cv-236** |
| **VS.** | : | **JUDGE MINALDI** |
| **U.S. COMMISSIONER OF SOCIAL SECURITY** | : | **MAGISTRATE JUDGE KAY** |

## REPORT AND RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of disability insurance benefits and supplemental security income benefits.  This matter has been referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

After review of the entire administrative record and the briefs filed by the parties, this court recommends that the Commissioner's decision should be AFFIRMED and this matter DISMISSED with prejudice.

## I.
## PROCEDURAL HISTORY

On February 25, 2010 plaintiff filed an application for disability insurance benefits and supplemental security income benefits alleging disability beginning on February 16, 2010.  Tr. 163-67, 168-73.  He claimed disability due to diabetes, hypertension, sleep apnea and depression. Tr. 191.  The claims were initially denied on June 25, 2010.  Tr. 77, 78.  Plaintiff requested and was granted an administrative hearing which was held on October 18, 2010.  Tr. 44-76.  Plaintiff was represented by an attorney at the hearing.  Plaintiff and a vocational expert ("VE") testified.

On January 19, 2011, the Administrative Law Judge ("ALJ") issued an unfavorable decision. Tr. 19-38. The ALJ found plaintiff had severe impairments of non-insulin dependent diabetes mellitus, hypertension, sleep apnea, and obesity. *Id.* He concluded that plaintiff was not disabled because he retained the residual functional capacity to perform a full range of work at all levels with certain limitations and that jobs existed in significant numbers in the national that plaintiff could perform. *Id.*

On March 24, 2011, plaintiff filed a request for appellate review of this decision. Tr. 18. On June 8, 2012, the Appeals Council denied his request for review. Tr. 12-14. On January 30, 2013, plaintiff filed suit in this court appealing the determinations of the Commissioner.[1] Doc. 1.

## II.
## FACTS AND MEDICAL EVIDENCE

### A. *Facts*

Plaintiff was 51 years old on the date of the hearing. Tr. 51. He testified that he is married and that his wife works during the day. Tr. 203, 212. He last worked in 2010 in construction as a boilermaker. Tr. 54. He stated that he stopped working because he collapsed on the job. Tr. 64. He worked from 1996 to 2010 as a boilermaker assistant for Turner Industries. Tr. 220. He testified that he left school in the 9th grade to join the Job Corps. Tr. 53. He was honorably discharged as a specialist from the Army in 1992. Tr. 55. When he returned from the Army he completed school and earned his GED. Tr. 52.

He stated that he cannot go back to work because he has severe muscle cramps all over his body, has high blood pressure, diabetes, dizziness and "mind battles." Tr. 63. According to plaintiff, his diabetes makes him dizzy and his high blood pressure makes his head feel like it is

---

[1] Plaintiff is proceeding *pro se* in this court.

pounding and his heart race.  *Id.*  He described his mind battles as not being able to grasp the things people tell him.  Tr. 64.  He testified that he can stand and or walk for 30 minutes to an hour, can pick up a gallon of milk but not two gallons and is able to help with household chores such as doing the dishes and laundry but not with vacuuming.  Tr. 67.

### B.  *Medical Evidence*

#### 1.    *Veterans Administration Medical Center*

The record evidence reflects that plaintiff has received medical care through the Veterans Administration ("VA") since at least June of 1998 when he complained of left wrist pain lasting for a month.  No deformities were noted and he was advised to try Motrin and a splint.  Tr.377. The records indicate he was next seen in April 2003 when he stated that his wife tells him he gasps for air when he is sleeping.  He had no chest pains and occasional back pain.  The notes indicate that he has a history of hypertension but was off his medication at the time.  An EKG was normal.  He was referred for a sleep study.  Tr. 373-74.

In May of 2003 plaintiff presented complaining of chest pain.  He was referred to cardiology.  His weight was 246 and blood pressure 160/80.  His ECG and chest x-ray were normal.  He was instructed to undergo treadmill testing to assess possible obstructive coronary artery disease.  Tr. 813-15.  At a follow up exam in June 2003 he reported no other problems since his last visit.  He was started on medication for high blood pressure and advised to lose weight.  Tr. 811-12.

At an appointment on August 1, 2003, plaintiff stated that he was not taking his blood pressure medication.  His blood pressure was 149/98.  He had burns to his chest and arms from an accident at work.  He was advised on how to treat his burns and instructed to take his medication daily.  Tr. 809-10.  At a treadmill stress test on November 7, 2003, plaintiff

completed 10 minutes of exercise.  He had no level of chest pain.  The impression following the test was excellent work tolerance, no evidence of ischemia.  It was further noted that he could undertake very heavy activity.  Tr. 363-64.  On February 20, 2004, plaintiff did not show for his appointment.  The nursing notes indicate that it was his second no show, that it appeared that he was not taking his blood pressure medication, and that he has not completed a hepatitis C workup or an anemia workup.  Tr. 362-63.

Plaintiff was a walk-in patient on April 11, 2005.  He complained of back pain.  It was noted that he was "unassigned due to previous no shows."  He was given an appointment at 1:40 on the same day but again did not show up.  Notes indicate that he would not be rescheduled.  Tr. 359.

On October 11, 2006, plaintiff was seen for a new initial visit after a two year absence. He reported that a private physician recommended that he get a prescription for hypertension. He was not taking any medication at the time.  He complained of daily headaches lasting for two weeks.  The physician assessed poorly controlled hypertension and prescribed medication.  Tr. 356-59.

At his next visit in March 2007 plaintiff complained of headache, dizziness, chest pain lasting one day, and pain in the upper left side of chest.  His blood pressure was 164/120.  After administering medication, his blood pressure was 132/98 in his right arm and 126/96 in his left arm.  Plaintiff's wife stated that he had been eating foods high in sodium the last few days. Plaintiff was instructed to take all medications as prescribed and to control sodium in his diet. Tr. 351-53.

Plaintiff returned on March 30, 2007, for a follow up blood pressure check.  He stated that he did not take his medication today.  His blood pressure when first measured was 139/102.

A second reading was 150/106.  He was given medication and when his blood pressure was taken again it was 125/91.  Plaintiff was advised to take his medication as prescribed and to return for a follow up appointment.  Tr. 350-51.  On April 10, 2007, plaintiff's blood pressure was 147/113.  He stated that he took his medication that morning.  The physician's assessment following the appointment indicated poorly controlled hypertension.  The doctor increased plaintiff's medication.  Tr. 345-50.  On April 18, 2007, plaintiff presented for a follow-up blood pressure check.  His blood pressure was 138/94.  Plaintiff stated that he was taking his medication every day.  Tr. 345.  On a subsequent visit of May 1, 2007, his blood pressure was 139/103.  Plaintiff admitted to not taking his medication that morning.  Tr. 344.  On May 9, 2007, his blood pressure was 123/85.  It was noted that this was much improved and plaintiff stated that he took his medication that day.  Tr. 340-44.

On August 15, 2007, plaintiff's blood pressure was initially 154/114 and after medication was administered was 142/108.  The physician noted that he was not refilling his prescription. Tr. 335-40.  He returned on August 22, 2007, with a blood pressure reading of 138/96.  He stated that he was taking his medication every morning as ordered.  Tr. 331-32.  On August 29, 2007, plaintiff again stated that he was taking his medication every day and his blood pressure was 132/100.  The physician noted that his hypertension was improving.  Tr. 331-32.  On September 12, 2007, the physician noted that plaintiff's hypertension was fairly controlled but noted poor compliance in that he was not refilling his prescription.  Tr. 327-30.  On November 8, 2007, plaintiff reported that he had reduced potion sizes and decreased his salt intake and was taking medication as directed.  His blood pressure was 131/98.  The physician noted no improvement and increased his prescription.  Tr.  322-26.

The records indicate that plaintiff was next seen on May 8, 2008.  His blood pressure was 143/103.  He stated that he was in pain due to two broken teeth and attributed his high reading to his pain level.  He stated that he was taking his medication as directed but was not complying with a low salt diet.  The physician noted poorly controlled hypertension with treatment compliance problems.  He informed plaintiff that if he did not refill his medication he would discharge him on the next visit.  Plaintiff was also referred to social service for counselling on compliance problems.  Tr. 315-21.  On July 29, 2008 plaintiff requested a refill of his medication.  It was noted that he was not refilling on schedule.  Tr. 757-58.  Plaintiff did not show for an appointment on August 7, 2008.  Tr. 757.

On November 12, 2008 plaintiff presented at the medical center for follow-up.  His blood pressure reading was 153/115.  He stated that he had not taken his medication for several months.  Plaintiff was counselled on the importance of compliance with medication.  He was instructed to return for weekly blood pressure checks.  Tr. 306-14.

On February 27, 2009, plaintiff was a walk-in at the medical center and complained of feeling tired, weak, drained, frequent urination, and having a decreased appetite.  He stated that he lost 25 pounds in 2 to 3 months.  He stated his blood sugar reading that morning was 400.  His blood pressure was 142/101.  He was treated in the emergency department with medication and advised to follow up with his primary care physician.  Tr.  299-307.

Plaintiff was next seen on May 12, 2009, for a scheduled revisit.  He stated that he was recently seen for elevated blood glucose and that he has been taking his medication daily.  His blood pressure was 137/97.  The physician's assessment was poorly controlled hypertension, diabetes mellitus, and hyperlipidemia.  He was given a glucometer and educated on control and complications of diabetes.  Tr. 289-98.

On May 22, 2009, plaintiff arrived complaining of chest pain that started while at work the day before.  He described the pain as intermittent left sided pain that happens when he smells a certain smell at the chemical plant where he works.  He also stated his chest hurts when he moves his left arm or twists his trunk.  His blood pressure was 146/101.  He stated that his primary care physician had increased his blood pressure medication but he had not started that yet.  A cardiac work up was ordered.  Chest x-rays showed no active chest disease and no abnormalities were noted on the x-ray of his abdomen.  Tr. 723-31.  267-68.

On October 23, 2009, plaintiff complained of a rash on both arms.  He stated that he has not renewed his prescriptions for his medications because he cannot afford to pay for them.  He also stated that he has not been monitoring his blood glucose.  He was administered medication and his blood pressure lowered to 153/112.  Plaintiff was counselled on the importance of compliance with medication and complications of uncontrolled diabetes and hypertension.  He was referred to a social worker for assistance with money for medication.  Tr. 417-24.  On November 17, 2009, plaintiff presented for a follow-up visit.  He stated that he was taking his medication but admitted to skipping some dosages.  He reported symptoms of sleep apnea.  His blood pressure was 140/98.  Tr. 413-16.

Plaintiff was referred to the Louisiana Sleep Diagnostics and underwent a CPAP Titration Study on December 30, 2009.  He was diagnosed with severe sleep apnea with an excellent response to CPAP treatment.  Tr. 239-47.

On January 6, 2010, plaintiff complained of having cramps in his hands and legs when working.  He stated that he took his blood pressure medication that morning.  At the appointment his blood pressure reading was 144/100.  He reported that he was feeling depressed due to personal problems.  He stated that he feels short of breath after walking more than a block.  The

physician noted that he was not filling his prescriptions on schedule, ordered a stress test, echocardiogram, chest x-ray, and referred him to a psychologist for his depression.  Tr. 406-12. Plaintiff declined a psychology consult appointment because he stated that he could not take time off of work.  He inquired about VA disability and was referred to Veterans Services.  Tr. 381.

On January 19, 2010, plaintiff arrived at the medical center stating that he wanted to see a dermatologist, wanted the results of this sleep apnea test, and that his blood pressure might be high.  His blood pressure was 194/138.  He admitted to not taking his medication daily.  He was given medication to lower his blood pressure and instructed on the importance of taking his medication daily.  Tr. 398-406.  Chest x-rays showed no visualized active chest disease.  An EKG was normal and the physician noted no change from 2003.  Tr. 267, 397.

On February 3, 2010, plaintiff reported for a stress test.  He completed 5 minutes on the treadmill and stopped suddenly with complaints of dyspnea.  The notes indicate no chest pain, no evidence of ischemia, and no signs of respiratory distress.  The physician's notes indicated that his behavior was "suspect."  Tr. 459.

On February 19, 2010, plaintiff was a walk-in at the clinic.  He complained of cramping in his hands and high blood pressure at work on February 16, 2010.  He stated that he needed a paper filled out to return to work.  His blood pressure was 147/98.  He was told to return to the clinic for blood work and for another appointment.  Tr. 677-80.  Plaintiff returned on February 23, 2010.  His blood pressure was 143/106 and he admitted that he did not take his medication that morning.  He was advised to take Oscal for cramping and to return in one week.  Tr. 671-75. On February 24, 2010, plaintiff was called to come in due to elevated glucose levels.  The notes indicate that his blood pressure was 144/102.  The physician noted poorly controlled diabetes and hypertension.  Tr. 669-70.

Plaintiff arrived for a follow-up visit on April 23, 2010, still complaining of cramping and he voiced concern about his kidneys.  He stated that the company he works for told him to stop working.  His blood pressure was 148/108.  Plaintiff requested a release to return to work.  The physician noted his poorly controlled hypertension and his poor compliance with medications.  He refused to issue a return to work reasoning that he did not know his job requirements and that the company doctor would be in a better position to make that determination.  He noted that plaintiff had a normal stress test last year.  Tr. 659-64.  Plaintiff returned for a blood pressure check on April 26, 2010.  His blood pressure was 155/115.  He requested to change his physician to Dr. Torres.  He stated that he cannot return to work without medical clearance.  He reported generalized muscle cramps that have recently gotten worse especially with sweating.  Tr. 655-58.

On May 14, 2010, plaintiff had his initial appointment with Dr. Carisa Torres-Vazquez.  Plaintiff complained of lower back pain and spots on his back that burn.  His blood pressure was 160/108.  Dr. Torres Vazquez noted that her complete history and physical notes would follow.  Tr. 651-55.

A stress test performed on June 1, 2010, showed considerable improvement from the previous test on February 3, 2010.  The physician interpreting the results opined that while plaintiff did not achieve the target, the results were essentially negative by virtue of achievement of high workload.  He found that plaintiff's fitness was good.  Tr. 649-51.  The results of a Holter Moniter Study were unremarkable.  Tr. 646.

On July 7, 2010, plaintiff was contacted by phone to inform him of the results of his lab testing.  He was told that his glucose levels were high and he was instructed on the risks of diabetes.  He was instructed to limit sweets, starches and fruits from his diet.  The nursing notes

indicate that plaintiff was "in shock" and he asked the nurse to explain the information to his wife. Tr. 646.

On July 19, 2010, plaintiff arrived with his wife for a follow-up appointment. His wife reported that plaintiff was getting more forgetful. Plaintiff stated that he was under a lot of stress because he was not working. He reported that his head feels foggy and his vision is blurry. He stated that he did not take his medication today because it makes him feel dizzy. His blood pressure was 136/102. Plaintiff and his wife were instructed on the complications of diabetes. Tr. 642-45.

The records indicate that plaintiff was referred to a social worker to discuss his depression about losing his job, financial difficulties, chemical exposure, and pending lawsuit. The social worker indicated that she contacted the attorney who was handling his civil case to inquire about several issues. She recommended that plaintiff and his wife make an appointment with the attorney to discuss new information about his case. He was advised to return in one month. Tr. 842-43. On September 2, 2010, plaintiff met with the social worker for a follow-up appointment. He reported that he was doing better and not feeling as depressed. Plaintiff stated that he is concerned with his memory loss and lack of ability to focus and concentrate which he thinks may be due to his exposure to chemicals at his past employment. He expressed a desire to consult with a psychiatrist to determine the extent of his memory loss. He stated that his medication is helping with his depression. Tr. 841.

A September 3, 2010, a CT scan of plaintiff's brain was conducted because of complaints of headaches and the test showed normal results. Tr. 825.

On September 13, 2010, Gina Beverly, Ph.D. conducted a neuropsychological evaluation on referral from his primary care physician to evaluate his memory loss. His neuropsychological

testing revealed intact functioning in the majority of cognitive areas with mild impairment in attention, mental tracking, and letter fluency.  The results suggested difficulties secondary to emotional factors.  The psychologist recommended that he continue with therapy with the social worker and also see a psychiatrist to determine medication for mood management.  Tr. 835-39.

Plaintiff underwent a psychiatric consult with Lyndon Greene, M.D. on October 6, 2010, for the purpose of assisting with his medication management.  Following the evaluation the psychiatrist recommended several changes in his medication.  He did note, however, that there appeared to be issues of secondary gain with the plaintiff and he could not rule out malingering. He noted a discrepancy between his claimed stress and the objective findings and lack of cooperation in the diagnostic evaluation.  He opined that plaintiff did not appear to have an antisocial personality but was genuinely concerned about his financial problems.  He found his effort during the interview "less than expected" and he is not sure how committed plaintiff is to participate in treatment as his motivation appears limited.  The doctor noted that while he was escorting plaintiff to the waiting area plaintiff commented that "all [plaintiff] needs is financial assistance like SSI and he would be OK."  Tr. 828-35.

### 2.    *David G. Atkins, Ph.D.*

A psychiatric review technique was conducted on April 17, 2010, at the request of disability services.  Dr. Atkins opined that plaintiff suffers from an affective disorder with mild restrictions on activities of daily living, maintaining social functioning, maintaining concentration, persistence and pace, and no episodes of decompression.  He found that the plaintiff's impairment is not severe and does not limit his ability to perform and sustain work-related tasks such as understanding, carrying out, and remembering simple instructions, use of

judgment, responding appropriately to supervision, coworker's and usual work situations, and dealing with changes in a routine work setting.  Tr. 82-84.

### 3.      *Residual Functional Capacity*

On April 23, 2010, a non-medical single decision maker opined that plaintiff possessed the RFC to perform a full range of work with the limitation of no exposure to any workplaces hazards such as machinery and heights.  Tr. 84-87.

### 4.      *Carisa Torres-Vazquez, M.D.*

Dr. Carisa Torres-Vazquez, plaintiff's last physician at the VA clinic, completed a mental RFC assessment on July 19, 2010.  She opined that plaintiff suffered from moderate limitations in his ability to understand and remember short and simple instructions, carry out short and simple instructions, perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances, and work in coordination with or proximity to others without being distracted by them.  She found he had marked limitation in his ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, make judgments on simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and set realistic goals or make plans independently of others.  She additionally found that plaintiff had severe limitations in his ability to respond appropriately to work pressures in a usual work setting.  Dr. Torres-Vazquez explained her findings stating that plaintiff is suffering from anxiety, stress, and depression that has resulted in severe hypertension and difficult concentration.  Tr. 820-21.

Dr Torres-Vazquez also completed an assessment regarding plaintiff's abilities and limitations on July 19, 2010.  She opined that plaintiff has a condition that causes him to lie down at least 3 hours or more several days a week, that it is difficult for plaintiff to stay on his

feet for more than 30 minutes at a time without significantly increasing his pain, that plaintiff has difficulty using his hands for activities such as writing, driving, or typing for over 30 minutes at a time without significantly increasing his pain, that if plaintiff returned to work at a sit down job he would need to lie down periodically or take extra breaks to make it through the day, and that plaintiff has a condition where he has days that would interfere with his ability to leave the house to go to work at least once a week during an average month.   Dr Torres-Vazquez opined that plaintiff's limitations have existed since before February 2010.   She explained in the reasons for her opinion that she has known plaintiff since May 14, 2010, a review of his chart revealed hypertension since 2005; uncontrolled hypertension since November 2009; he reported anxiety, stress, and depression to her on May 14, 2010; and he has had muscle spasms since January 2010.  Tr. 823-24.

### III.
### STANDARD OF REVIEW

"In Social Security disability cases, 42 U.S.C. § 405(g) governs the standard of review." *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002) (citing *Frith v. Celebrezze*, 333 F.2d 557, 560 (5th Cir. 1964)).   The court's review of the ultimate decision of the Commissioner is limited to determining whether the administrative decision is supported by substantial evidence and whether the decision is free of legal error.  *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005) (citing *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994)).   "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Greenspan*, 38 F.3d at 236).    "It is 'more than a mere scintilla and less than a preponderance.'"  *Id.*  (quoting *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002)).   It is "such relevant evidence as a reasonable mind might accept to support a conclusion.  It must do more than create a suspicion of the existence of the fact to be established, but 'no substantial

evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

In applying the substantial evidence standard, the reviewing court critically inspects the record to determine whether such evidence is present, "but may not reweigh the evidence or substitute its judgment for the Commissioner's."  *Perez*, 415 F.3d at 461 (citing *Greenspan*, 38 F.3d at 236; *Masterson*, 309 F.3d at 272).  Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed.  *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  "Conflicts of evidence are for the Commissioner, not the courts, to resolve."  *Perez*, 415 F.3d at 461 (citing *Masterson*, 309 F.3d at 272).

# IV.
# LAW AND ANALYSIS

## A.  *Burden of Proof*

The burden of proving that he or she suffers from a disability rests with the claimant.  *Perez*, 415 F.3d at 461.  The Social Security Administration defines a "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" lasting at least twelve months.  42 U.S.C. § 423(d)(1)(A).  The ALJ conducts a five-step sequential analysis to evaluate claims of disability, asking:

(1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment[2]; (3) whether the claimant's impairment meets or

---

[2]  A severe impairment or combination of impairments limits significantly a claimant's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1521(a).  Basic work activities are defined at 20 C.F.R. § 404.1521(b).  The term severe is given a *de minimis* definition as found in *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985).  According to *Stone*, "[a]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience."  752 F.2d at 1101 (quoting *Estran v. Heckler*, 745 F.2d 340, 341 (5th Cir. 1984)).

> equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

*Id.* (citing 20 C.F.R. § 404.1520).  If the claimant meets the burden of proof on the first four steps, the burden shifts to the Commissioner on the fifth step to show that the claimant can perform other substantial work in the national economy.  *Id.*  "Once the Commissioner makes this showing, the burden shifts back to the claimant to rebut this finding."  *Id.* (quoting *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000)).

The analysis ends if the Commissioner can determine whether the claimant is disabled at any step.  *Id.* (citing 20 C.F.R. § 404.1520(a)).  On the other hand, if the Commissioner cannot make that determination, he proceeds to the next step.  *Id.*  Before proceeding from step three to step four, the Commissioner assesses the claimant's residual functional capacity (RFC).  *Id.*  "The claimant's RFC assessment is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record."  *Id.* at 461-62 (citing 20 C.F.R. § 404.1545(a)(1)).  Specifically, in determining a claimant's RFC, an ALJ must consider all symptoms, including pain, and the extent to which these symptoms reasonably can be accepted as consistent with the objective medical evidence and other evidence.  20 C.F.R. § 404.1529; Social Security Ruling 96-8p.  The ALJ must also consider any medical opinions (statements from acceptable medical sources) that reflect judgments about the nature and severity of impairments and resulting limitations.  20 C.F.R. § 404.1527, Social Security Rulings 96-2p, 96-6p.  The claimant's RFC is considered twice in the

---

If a severe impairment or combination of impairments is found at step two, the impairment or combined impact of the impairments will be considered throughout the disability determination process.  20 C.F.R. §§ 404.1520, 404.1523.  A determination that an impairment or combination of impairments is not severe will result in a social security determination that an individual is not disabled.  *Id.*

sequential analysis—at the fourth step it is used to determine if the claimant can still do his or her past relevant work, and at the fifth step the RFC is used to determine whether the claimant can adjust to any other type of work. *Perez*, 415 F.3d at 462 (citing 20 C.F.R. § 404.1520(e)).

Here, the ALJ found that plaintiff was not disabled because, while plaintiff was not capable of performing his past relevant work, his RFC allowed him to perform other jobs that existed in significant numbers in the national and local economy.

### B.  *Plaintiff's Claims*

As previously stated, plaintiff has filed this appeal *pro se* and his brief does not specifically state the areas in which he contends the ALJ erred in his findings.  As best the court can discern, plaintiff makes the following arguments:

1.  The ALJ erred in rejecting the opinion of Dr. Carisa Torres-Vazquez.

2.  The ALJ erred in rejecting certain testimony of the VE, John Yent.

After review of the record before us we find no merit with either contention.

### 1.  Did the ALJ err in rejecting the opinion of Dr. Carisa Torres-Vazquez?

Plaintiff submits that his primary care provider, Dr. Carisa Torres-Vazquez, opined that in a normal workday and workweek he would have severe limitations responding appropriately to work pressures in a usual work setting.  He also asserts that Dr. Torres-Vazquez found that he would have difficulty standing for more than 30 minutes due to his dizziness, blurred vision, headaches and muscle spasms.  Doc. 11, p. 6.  Although not specifically asserted in his brief, the court presumes that plaintiff intended to argue that the ALJ should have adopted the opinion of Dr. Torres-Vazquez and find him disabled.

The Commissioner contends that the ALJ properly evaluated the opinion of Dr. Carisa Torres-Vazquez.  Relying on *Brown v. Apfel,* 192 F.3d 492 (5th Cir.1999), the Commissioner

argues that a physician's opinions are not conclusive and may be rejected for good cause.  Here, the Commissioner asserts the ALJ properly rejected the opinion of Dr. Torres-Vazquez as internally inconsistent and inconsistent with the other medical evidence.

In assessing the medical evidence supporting a claim for disability benefits, the ALJ is bound by the "treating physician rule," which generally requires the ALJ to give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians. *Blakely v Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir.2009).  The ALJ must give a treating physician's opinion "controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence' ". *Martinez v. Chater,* 64 F.3d 172, 176 (5th Cir.1995) (quoting 20 C.F.R. § 404.1527(d)(2).  A treating physician's opinion may be given little or no weight "when the evidence supports a contrary conclusion".  *Newton v. Apfel,* 209 F.3d 445 (5th Cir.2000).  The ALJ must "always give good reasons ... for the weight [it affords the opinion]", 20 C.F.R. § 404.1527(d)(2), and must show good cause when giving that opinion little or no weight.  *Newton,* 209 F.3d at 455. Good cause which permits an ALJ to discount the weight of a treating physician relative to other experts exists where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence."  *Newton,* 209 F.3d at 455–56 (citation omitted); see also *Martinez v. Chater,* 64 F.3d 172, 176 (5th Cir.1995).

In rejecting the opinion of Dr. Torres-Vazquez, the ALJ noted the inconsistencies in her opinions, the lack of treatment notes in the record, and the contradicting evidence from other medical professionals and physicians.  The ALJ stated:

> Based on the entire record, the medical opinions offered by Dr. Torres-Vazquez have been disregarded as being internally inconsistent and

inconsistent with and unsupported by the balance of the medical evidence.
To begin, Dr. Torres-Vazquez assess the claimant as having marked to
extreme mental and functional limitations secondary to his uncontrolled
hypertension and associated symptom, yet offered no discussion on how his
long history of deliberate medication noncompliance may have contributed
to his asserted symptoms.  Further, Dr. Torres-Vazquez offered conflicting
opinions relative to the claimant's ability to maintain attention and
concentration.  As noted, she indicated on one form that the claimant had a
marked limitation in his ability to maintaining [sic] attention and
concentration for extended periods, yet opined on the other form that he had
no difficulty maintaining concentration for activities such as reading books
or understanding the plot behind a movie.  It is also noted that very few
progress notes document actual visits between the claimant and Dr. Torres-
Vazquez.

As to the opinions relative to claimant's mental limitations, the balance of
the record, including the evaluations from the VA psychiatrist and
psychologist, do not support Dr. Torres-Vazquez's opinions of marked and
severe mental functional limitation.    As noted herein, Dr. Beverly
concluded that the claimant demonstrated intact functioning in the majority
of assessed cognitive domains, with only mild impairment in attention,
mental tracking, and letter fluency.  Further, Dr. Greene diagnosed only
adjustment disorder, with mixed emotion, and could not rule out
malingering because of possible issues of secondary gain.  Finally, the
claimant and his wife indicated in application documents that the claimant's
mood and ability to handle stress were improved with antidepressant
medication.  As noted in the VA progress notes and subsequent social
worker reports, the claimant was prescribed a low dose of Zoloft since
about March 2010.  However, there is nothing to support that the claimant
was fully compliant with the antidepressant medication, especially
considering his regular admissions of noncompliance to his diabetes and
antihypertensive medications.

Tr. 35.  The court finds that the ALJ gave articulate and legally sound reasons for rejecting the

opinion of Dr. Torres-Vazquez.  For this reason we find plaintiff's argument without merit.

Furthermore, at the time Dr. Torres-Vazquez rendered her opinion the records indicate

that she had only seen plaintiff on one, possibly two, occasions.[3]  It is therefore questionable

---

[3] Plaintiff's initial visit with Dr. Torres-Vazques was on May 14, 2010.  Tr.651-656.  The only other reference to Dr.
Torres-Vazquez in the medical evidence is in a nursing note on July 19, 2010 which provides that after plaintiff was
seen by the nurse he was "refer[red] to Dr. Torres."  Tr. 645.  There are no physician notes from Dr. Torres-Vazques
in the record for that day although her mental RFC and assessment regarding plaintiff's abilities and limitations are
dated July 19, 2010.

whether or not Dr. Torres-Vazquez should even be considered a treating physician.  *See* 20 C.F.R. § 404.1502 (defining a treating source).

      **2.**      **Did the ALJ err in rejecting certain testimony of the VE?**

Plaintiff asserts that VE testified that a person would need to be able to remember, focus, and concentrate in order to maintain an unskilled job.  Plaintiff also notes that the VE testified that a person who cannot maintain a normal workweek and workday without interruptions from psychologically-based symptoms, who cannot perform at a constant pace without having to miss more than one day a month, and who cannot endure more than 30 minutes standing, would have difficulty maintaining a job.  Again, although not specifically asserted, the court believes that plaintiff intended to argue that the ALJ should have accepted this testimony of the VE and find plaintiff disabled.  Doc. 11, p. 7.

In response, the Commissioner argues that the limitations plaintiff lists from the VE testimony are taken from Dr. Torres-Vazquez's assessments which the ALJ properly rejected. The Commissioner maintains that this testimony is therefore immaterial.  We agree.

At the administrative hearing the VE testified that a person of plaintiff's age, with the same work history and education background, who must avoid all exposure to workplace hazards such as machinery and heights, could not return to his past relevant work.  However, the VE testified that at least three other occupations, such as an office cleaner/janitor, landscape groundskeeper, and a dishwasher, existed in significant numbers in the national economy that such a person could perform.  Tr. 73-74.  Under cross-examination by plaintiff's attorney the VE testified that if an individual was forgetting simple instructions on an occasional basis (which would be up to a third of the time) such a person would be unable to keep an unskilled job.  The VE further testified on cross-examination that if a person is not able to maintain regular

attendance at work, once a pattern is detected and the absenteeism is greater than one day per month, such a person would not be able to maintain employment.[4]  Tr. 75-76.

In his opinion, the ALJ rejected the opinions of Dr. Torres-Vasquez and for the reasons set forth above we find that his reasons for rejecting her opinions are valid.  Instead the ALJ determined that the evidence and entire record supported an RFC finding that plaintiff was capable of performing a full range of work at all exertional levels but must avoid all exposure to workplace hazards such as dangerous moving machinery and unprotected heights.  Tr. 26-27.

The Fifth Circuit has long held that a hypothetical question that an administrative law judge poses to a vocational expert need only incorporate the disabilities that the administrative law judge recognizes.  *Bowling v. Shalala,* 36 F.3d 431, 434 (5th Cir.1994).  The ALJ is not bound by vocational expert testimony that is based on evidentiary assumptions that the ALJ ultimately rejects.  *Ownes v. Heckler,* 770, F.2s 1276, 1282 (5th Cir. 1985).  When hypothetical testimony by a VE is unsupported by the evidence, the ALJ may disregard that testimony.  *Id.*

The ALJ here asked the vocational expert a hypothetical question that included the RFC that he found was supported by the evidence in the record and disregarded the testimony proffered on cross-examination..  We find that the ALJ did not err in disregarding that testimony as being unsupported by the evidence.  We therefore find this argument without merit.

## V.
## CONCLUSION

Based on the foregoing, we find substantial evidence of record and relevant legal precedent support the ALJ's decision that plaintiff is not disabled.   It is therefore RECOMMENDED that the ALJ's decision be AFFIRMED and this matter be DISMISSED with prejudice.

---

[4] These limitations incorporate Dr. Torres-Vazquez's mental RFC assessment and her assessment regarding plaintiff's abilities and limitations.

Under the provisions of 28 U.S.C. §636(b)(1)(C), the parties have fourteen (14) days from receipt of this Report and Recommendation to file any objections with the Clerk of Court. Timely objections will be considered by the district judge prior to a final ruling.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING ON APPEAL, EXCEPT UPON GROUNDS OF PLAIN ERROR, THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT.**

THUS DONE this 6th day of February, 2015.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE